UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 6:25-CR-83-REW-HAI |
| v. ) | |
| ) | OPINION & ORDER |
| SAMUEL HATFIELD, ) | |
| ) | |
| Defendant. | |

\*\*\* \*\*\* \*\*\* \*\*\*

Defendant Samuel Hatfield, through counsel, moves to suppress evidence stemming from the search of a backpack alleged to belong to him. *See* DE 15 (Motion). Hatfield contends that officers searched his backpack without a warrant in violation of the Fourth Amendment. *See id*.

The Government responded in opposition to Hatfield's motion, *see* DE 23, and Hatfield filed a timely reply, *see* DE 24. The Court held an evidentiary hearing, *see* DE 28, and the matter is now ripe for decision. The Court **DENIES** Hatfield's suppression motion. Because he objectively abandoned the subject backpack, the officers' search did not implicate the Fourth Amendment.

I.   BACKGROUND

Per reports, on June 21, 2025, the Williamsburg Police Department executed a controlled drug buy from Defendant. *See* DE 15-1. Following the transaction, a CI advised law enforcement that Hatfield, known to be a convicted felon, had a firearm on his person. *See id*. at 1-2.

On July 9, 2025, Corporal Estes Rhodes and Officer Chris Brown of the Corbin Police Department, who were aware of the Williamsburg allegations, received information via tip that Hatfield had been seen around businesses at Exit 29 from Interstate 75 in Corbin. *See id*. at 2.

Both officers, each responding separately to the tip, made their way to the area to locate and contact Hatfield regarding his alleged participation in drug trafficking and illicit firearm ownership. *See id*. At approximately 12:40 a.m., while driving in his marked cruiser, Corporal Rhodes spotted Hatfield walking behind the local L&N Bank. *See* Rhodes Vid. 1. At the suppression hearing, Corporal Rhodes testified that Hatfield, consistent with the informant's tip, wore a white t-shirt, blue jeans, and carried a red and black backpack. He noted that Hatfield wore the backpack on his back, with a strap secured over at least one of Hatfield's shoulders. Corporal Rhodes attempted to approach Hatfield, but Hatfield, upon noticing Corporal Rhodes, fled into a grass field behind the bank, toward a wooded area. Corporal Rhodes, thirty (30) to forty (40) yards behind, exited his cruiser, gave chase, and commanded Hatfield to stop. Hatfield ignored the verbal demands and vanished into the dark and brush.

At the hearing, Corporal Rhodes testified that he could see Hatfield for thirty (30) to forty (40) yards before he lost him in the cover. During the pursuit, Hatfield maintained possession of the backpack as he ran from Corporal Rhodes. Upon losing Hatfield, Corporal Rhodes radioed responding officers that Hatfield was, in fact, wearing a white t-shirt with blue jeans and carried a red and black backpack, and that they should attempt to intercept Hatfield in the area. *See* Rhodes Vid. 1 at 00:41:01-00:41:04. At approximately 12:41 a.m., Officer Brown responded that he saw Hatfield run behind the nearby fitness center. *See id.* at 00:40:08-00:41:42. At that time, Officer Brown observed Hatfield no longer wearing the red and black backpack. *See* DE 15-1. Corporal Rhodes joined Officer Brown at the scene, and the pair unsuccessfully searched the surrounding woods, including a proximate homeless encampment, for signs of Hatfield. *See id*.

Based upon Officer Brown's observation of Hatfield without a backpack, Corporal Rhodes returned to the grass field behind the L&N Bank in an attempt to locate the backpack. *See id*.

Corporal Rhodes testified that while retracing Hatfield's steps,[1] he found a trail through the field that led to a hole in a chain-link fence, which likely allowed Hatfield to evade Rhodes. Hatfield evidently knew about the hole in the fence, while Corporal Rhodes did not. *See* Rhodes Vid. 2 at 01:05:58-01:06:01. At the suppression hearing, Corporal Rhodes testified that he found the backpack approximately two (2) feet from a pathway through the field. The backpack was not buried beneath the tall grass and was clearly visible once he flashed his light on it. He located the backpack at approximately 1:05 a.m. *See id*. at 01:05:41. It lay about ten yards from the fence opening. The backpack, on the Court's viewing in the video, also appeared intact, with no visible damage to its straps or otherwise. *See id. generally*. The officers then opened and searched the backpack without a warrant, locating, among other things, a Phoenix Arms .22 caliber pistol. *See* DE 15-1. That firearm is the basis of Count 3 of the Indictment. *See* DE 1 at 2.

    The field where Rhodes found the backpack was open behind the L&N Bank. Although there was a fence separating that field from an adjacent property, the entry and perimeter itself was unfenced, and as noted, someone had cut a hole in the fence as the path went from the L&N Bank field and toward the homeless encampment. Corporal Rhodes had gone from the initial pursuit at the L&N Bank to the homeless encampment and then back to the L&N Bank field in the twenty-five minutes that elapsed between initial contact and backpack discovery. There is no proof to suggest that Hatfield returned to the L&N Bank field after the first encounter with Corporal Rhodes.

    Hatfield filed the instant motion to suppress the evidence seized from the search of the backpack. *See* DE 15. He alleges that the search, absent a warrant, violated his rights under the Fourth Amendment. *See id*. Anticipating the Government's position, Hatfield contends that

---

[1] Corporal Rhodes had taken an angled path into the brush, hoping to cut Hatfield off. When he returned to the site, he tried to follow Hatfield's original path.

abandonment cannot justify the warrantless search where neither officer explicitly observed Hatfield affirmatively act to disclaim ownership. *See id*. at 4. After receiving the Government's response, *see* DE 23, and Hatfield's reply, *see* DE 24, the Court held an evidentiary hearing where it heard arguments from the parties after testimony from both Corporal Rhodes and Officer Brown. *See* DE 28. All apt body-cam footage is in the record. The matter is now ripe for decision.

## II.    LEGAL STANDARD

"It is well settled that in seeking suppression of evidence the burden of proof is upon the defendant to display a violation of some constitutional or statutory right justifying suppression." *United States v. Feldman*, 606 F.2d 673, 679 n.11 (6th Cir. 1979). However, in assessing the reasonableness of a warrantless search, courts must begin "with the basic rule that searches conducted outside the judicial process, without prior approval by [a] judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Arizona v. Gant*, 129 S. Ct. 1710, 1716 (2009) (internal quotation marks omitted). Accordingly, the Government bears the burden of demonstrating an exception to the warrant requirement, *Taylor v. City of Saginaw,* 922 F.3d 328, 334 (6th Cir. 2019) (citing *United States v. Jeffers*, 72 S. Ct. 93 (1951)), by a preponderance of the evidence, *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974).

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The Amendment's protections extend to any thing or place with respect to which a person has a "reasonable expectation of privacy," *California v. Ciraolo*, 106 S. Ct. 1809, 1811 (1986) (quoting *Katz v. United States*, 88 S. Ct. 507, 516 (1967) (Harlan, J., concurring)), including one's personal luggage, *see e.g., United States v. Oswald*, 783 F.2d 663, 666 (6th Cir. 1986). By contrast, an

individual's Fourth Amendment rights are not infringed—or even implicated—by a search of a thing or place in which the person has no reasonable expectation of privacy. *See Hester v. United States*, 44 S. Ct. 445, 446 (1924).

Generally, officers do not need a warrant or probable cause to search or seize property that has been abandoned. *United States v. Eden*, 190 F. App'x 416, 421 (6th Cir. 2006) (citing *Abel v. United States*, 362 U.S. 217, 241 (1960)). The question of abandonment is a mixed question of law and fact that does not turn on legal title or traditional notions of property law. *Oswald*, 783 F.2d at 665-66. Instead, the question "is whether the person claiming the protection of the Fourth Amendment 'has a legitimate expectation of privacy in the invaded place.'" *Id.* at 666 (quoting *Rakas v. Illinois*, 439 U.S. 128, 143 (1978)). "[N]o person can have a reasonable expectation of privacy in an item that [he] has abandoned." *Eden*, 190 F. App'x at 421 (citing *Hester*, 265 U.S. at 58).

The concept of a reasonable expectation of privacy triggers a two-part inquiry: (1) whether the defendant exhibited a subjective expectation of privacy, and (2) whether his subjective expectation is "one that society is prepared to recognize as 'reasonable[.]'" *United States v. Tolbert*, 692 F.2d 1041, 1044 (6th Cir. 1982) (quoting *Katz*, 389 U.S. at 361 (Harlan, J., concurring)). In the context of abandonment, the Sixth Circuit has held that the focus must be on "whether [the property holder's] outward manifestations demonstrated that [he] sought to preserve the [property] as private, through the prism of a reasonable officer." *Eden*, 190 F. App'x at 425. Privacy expectations will vary with the type of property involved and with the property's location. *Oswald*, 783 F.2d at 666-67 (citing *United States v. Metzger*, 778 F.2d 1195, 1200 (6th Cir. 1985)). The Government must show "by a preponderance of the evidence that a 'defendant's voluntary words or conduct would lead a reasonable person in the searching officer's position to believe that

5

the defendant relinquished [his] interests in the item searched or seized.'" *Eden*, 190 F. App'x at 423 (quoting *United States v. Basinski*, 226 F.3d 829, 836-37 (7th Cir. 2000)).

The Sixth Circuit has held that if a person disclaims ownership of property, they have relinquished the necessary expectation of privacy in it. *See Tolbert*, 692 F.2d at 1045. Merely walking away from property, however, is insufficient to establish that the person abandoned it; the Government must establish that the person's "voluntary words or conduct, or any other manifestations of [his] intent, would lead a reasonable person in the [officer's] position to believe that [the defendant] relinquished [his] property interest in the [property]." *Eden*, 190 F. App'x at 426.

## III.   ANALYSIS

### a. Standing

Prior to addressing any alleged exception to the warrant requirement, the Government argues that Hatfield did not establish a possessory interest in the backpack and thus lacks standing to pursue a potential Fourth Amendment violation. *See* DE 23 at 6. But the Court confirmed at the hearing that, in a case where authorities searched a backpack that had been in the immediate possession of Hatfield, yielding inculpatory proof, the Government did not truly seek to press an Article III standing issue. As the Supreme Court held in *Terrence Byrd v. United States*:

> The concept of standing in Fourth Amendment cases can be a useful shorthand for capturing the idea that a person must have a cognizable Fourth Amendment interest in the place searched before seeking relief for an unconstitutional search; but it should not be confused with Article III standing, which is jurisdictional and must be assessed before reaching the merits.

138 S. Ct. 1518, 1530 (2018) (citing *Arizona Christian School Tuition Organization v. Winn,* 131 S. Ct. 1436 (2011)). Indeed, because Fourth Amendment "standing" is necessarily intertwined with the merits of an action, it "is more properly subsumed under substantive Fourth Amendment

doctrine." *See id.* (quoting *Rakas,* 99 S. Ct. at 425 (1978)). The Fourth Amendment standing analysis collapses into the substance of Hatfield's claim, which is how the Court will proceed.

### b. Abandonment

Turning to the merits of the alleged Fourth Amendment violation, the Government claims that Hatfield abandoned the backpack when he fled from law enforcement and left the backpack in a public field. *See* DE 23 at 7-11. Hatfield disputes abandonment, arguing that the absence of any affirmative act by him (one that law enforcement witnessed) disclaiming ownership indicates that no reasonable officer could infer Hatfield had an intent to abandon. *See* DE 24 at 2-3. Hatfield's argument fails for several reasons.

To begin, the lodestar for the abandonment analysis is whether Hatfield's "voluntary words or conduct, or any other manifestations of [his] intent, would lead a reasonable person in the [officer's] position to believe that [the defendant] relinquished [his] property interest in the [item]." *Eden*, 190 F. App'x at 426. Both officers in this case subjectively perceived abandonment, that Hatfield had "ditched" the backpack. Hatfield claims that the officers could not reasonably have inferred an intent to abandon because they did not explicitly observe Hatfield discard or separate from the backpack. *See* DE 24 at 3. This, Hatfield posits, places this case within the ambit of *United States v. Sanders*, 719 F.2d 882 (6th Cir. 1983). *See* DE 15 at 4-5.

Specifically, Hatfield notes that the fact that the officers did not observe him physically discard the backpack leaves open the possibility that Hatfield may have inadvertently dropped the backpack while still retaining a subjective and reasonable expectation of privacy. *See* DE 15 at 6. This argument, however, misunderstands the test for abandonment. The abandonment inquiry asks whether the outward manifestations of Hatfield's subjective intent could lead a reasonable officer to believe Hatfield relinquished his interest in the discarded property. *Eden*, 190 F. App'x at 426.

7

It is true that the officers did not witness *exactly* how or when the backpack made its way from Hatfield's person to the field. However, the record is replete with evidence refuting an accidental loss scenario and demonstrating that a reasonable officer could conclude that Hatfield intended to abandon the backpack. Corporal Rhodes testified that he observed Hatfield wearing a red and black backpack on his back, with at least one of the straps secured over his shoulder. This squared with a tip from the area. After Rhodes attempted to approach Hatfield, Hatfield bolted into a nearby field. Corporal Rhodes pursued Hatfield for approximately thirty (30) to forty (40) yards before losing him. Throughout the pursuit, the backpack remained on Hatfield's back. Later discovery of the backpack revealed it was intact with no visible damage to the straps. The position of the backpack on Hatfield's back, his prolonged control of the backpack during hot pursuit, and the lack of any visible damage refute any inference of accidental loss.

In *United States v. Gonzalez*, the Eastern District of Tennessee encountered similar circumstances. No. 3:24-CR-122-TAV-JEM, 2025 WL 2375388 (E.D. Tenn. Aug. 15, 2025). There, an officer executed a traffic stop on a vehicle. *Id*. at *1. The defendant, carrying a brown backpack, ran from the vehicle, and two other officers—Officers Barnes and Torres—responded to the scene and pursued the defendant. *Id*. at *2. Officer Torres then observed the defendant duck behind a hedge. *Id*. When he reappeared, Officer Torres noted the absence of the brown backpack. *Id*. Officers later found the backpack and seized drugs and identification documents for the defendant. *Id*. The Court upheld the warrantless search of the pack, finding that the defendant had abandoned the backpack when he discarded it in a public parking lot during his flight from law enforcement. *Id*. at *7-8.

Though only persuasive, *Gonzalez*, with its striking factual similarity, provides apt guidance. Hatfield attempts to distinguish the case by claiming that *Gonzalez* involved a much

8

shorter disappearance of view from law enforcement. *See* DE 24 at 4. This is important, he alleges, because the longer duration increases the possibility that an accidental or unintended loss occurred rather an intentional abandonment. Hatfield, however, overestimates the duration of time that he disappeared from law enforcement view. Here, Corporal Rhodes first noticed Hatfield at approximately 12:40 a.m. *See* Rhodes Vid. 1. Officer Brown then saw Hatfield run behind the fitness center without the backpack at 12:41 a.m. *See id*. at 00:40:08-00:41:42; *see also* DE 15-1. The lapse between Rhodes exiting his cruiser on Hatfield's heels and Brown seeing Hatfield was less than 100 seconds. The compressed temporal sequence soundly defeats Hatfield's attempt at distinguishing *Gonzalez*.

Moreover, the timing is significant for another reason. Approximately twenty-five (25) minutes passed between Hatfield discarding the backpack and Corporal Rhodes finding it. *See* Rhodes Vid. 2 at 01:05:41. This timeframe was undoubtedly sufficient to permit Hatfield to circle back and reclaim the dropped property if he so desired. Further, Corporal Rhodes testified that Hatfield, as a reasonable inference, had prior knowledge of the hole in the fence and the path through the field. Hatfield's familiarity further supports possible reclamation. And though a defendant's subjective desire to later reclaim discarded property has little substantive bearing on the abandonment analysis, *see United States v. Hill*, No. 24-CR-20521, 2025 WL 1684233, at *10 (E.D. Mich. June 16, 2025) (citing *United States v. Burnett*, No. 24-1443, 2025 WL 40850, at *3 (7th Cir. Jan. 7, 2025)), the absence of evidence indicating that Hatfield—with his familiarity of the area and significant time to double-back—attempted to get the backpack logically informs whether a reasonable officer would perceive abandonment by Hatfield.

Though the record cuts against an accidental loss scenario, even if the Court confronted the possibility, Hatfield's reliance on *Sanders* remains misplaced. In *Sanders,* the defendant checked

9

a suitcase containing cocaine and marijuana on her flight north from Florida. 719 F.2d at 883. Believing that she was under surveillance, Sanders left the airport at her destination without retrieving her suitcase from the official baggage claim area. *Id.* at 884. When questioned by law enforcement officials, she responded that she had not claimed the suitcase because she was not going straight home. *Id*. Sanders refused to consent to a search of the suitcase, thus actively indicating an interest in keeping the contents private. *Id*. Under these circumstances, the Sixth Circuit held that there had been no abandonment. *Id*. at 885-86.

Hatfield's circumstances differ in key respects from *Sanders*. Here, Hatfield discarded the backpack in an open, public field, *see* DE 15-1, where the defendant in *Sanders* left her suitcase in the baggage claim area. The location of the discarded property serves as evidence of the defendant's intent and informs whether a reasonable person in the officer's position could have inferred abandonment. *See Oswald*, 783 F.2d at 666-67 (citing *Metzger*, 778 F.2d at 1200). On this point, the Sixth Circuit has expressly distinguished a checked suitcase left in an airport baggage claim (a secure and regulated spot) from similar closed containers left in more public areas.

In *United States v. Oswald*, the defendant sought to suppress cocaine found in a briefcase in the trunk of a burned car that he left on the side of the highway. 783 F.2d at 663. The Court stated that while a briefcase "is property of a kind in which the owner or bailee normally has a strong expectation of privacy . . . such an expectation can be given up." *Id.* at 666. The Court distinguished Oswald's decision to leave the suitcase in a burned car on the side of the highway with the decision by the defendant in *Sanders* to leave a checked suitcase in an airport baggage claim:

> When one leaves a suitcase in an airport baggage claim area, he leaves it in a place where there is normally some measure of security. It is reasonable to expect that

10

> checked luggage will be locked up, if not claimed within a reasonable time, and will be kept safe until the person holding the claim check comes to retrieve it. One who choses [sic] to leave luggage in an unlocked burned-out automobile at the side of a highway in the country can fairly be thought to have a much lower expectation of privacy—and Oswald's expectation, as we know, was very low indeed. Flaming cars do tend to attract a certain amount of attention. The flames may keep people at a respectful distance for a time, but fires eventually die out; and a fire-ravaged automobile, left unprotected in the open countryside, invites [examination].

*Id*. at 667.  The Circuit, considering the location of the discarded briefcase and the fact that Oswald did not take any steps within a reasonable amount of time to stake his claim to the vehicle and its contents, upheld the trial court's finding of abandonment.  *Id*. at 667-69.

Hatfield's decision to leave the backpack in an open, public field more closely parallels *Oswald*'s briefcase on the side of a highway rather than *Sanders*'s suitcase in an airport baggage claim.  Indeed, the circumstances surrounding the discovery of Hatfield's backpack are telling.  After searching the surrounded wooded area for Hatfield to no avail, Corporal Rhodes testified that he returned to the field to retrace Hatfield's steps.  In doing so, Rhodes discovered a path through the field leading to a hole in a chain-link fence that had allegedly allowed Hatfield to escape.  *See* Rhodes Vid. 2 at 01:05:45-01:05:57.  Corporal Rhodes testified that he found the backpack not far from the hole in the fence and approximately two (2) feet from the pathway through the field.  Taking into account the backpack's proximity to the path and the hole in the fence, a reasonable person in the officer's position may surely conclude that Hatfield, in his frenzy to escape, ditched the backpack to lighten his load, to separate himself from contraband given the pursuing officer, and/or to pass more easily through the hole in the fence.  Further, Corporal Rhodes testified that the backpack was not buried beneath but rather sat atop the tall grass and was clearly visible once he flashed his light on it.  Unlike *Sanders*, where the suitcase was left in a secure airport baggage claim, Hatfield's backpack was left in public view and in a location readily accessible to any individual traversing the path.  Hatfield simply cannot claim a reasonable

11

expectation of privacy in an item left clearly visible along a pathway commonly traversed by or open to the public.

The Government soundly clears its burden to show by a preponderance of the evidence that Hatfield's conduct would lead a reasonable person in the officers' position to believe that Hatfield relinquished his interest in the backpack. Hatfield, on foot at midnight, immediately fled upon noticing Corporal Rhodes. The position of the backpack on Hatfield's back, his prolonged control of the backpack during a high-intensity pursuit, and the lack of any visible damage to the bag cut sharply against any accidental loss scenario. Nothing suggests Hatfield returned to seek or claim the bag he voluntarily left behind. On the totality of circumstances, the discovery of the backpack two (2) feet from the trail, unobscured by brush and plainly visible, eliminates any reasonable expectation of privacy. A reasonable person in the officers' positions would believe Hatfield had abandoned the backpack.

A few additional notes:

The Sixth Circuit repeatedly has deemed items discarded during flight to be abandoned. *See United States v. Rumph*, 145 F.3d 1334, at *3 (6th Cir. 1998) ("[O]ne does not manifest a subjective expectation of privacy in a plastic bag by throwing it away when the police come into view."); *United States v. Foster*, 65 F. App'x 41, 46 (6th Cir. 2003) ("By the time the officers confiscated the phone, however, the defendant had fled from the scene and had abandoned the vehicle he was driving. Such abandonment extinguishes any reasonable expectation of privacy the defendant might once have had in the property, together with any accompanying Fourth Amendment protections."); *see also generally United States v. Collis*, 766 F.2d 219, 222 (6th Cir. 1985). The Supreme Court has said the same thing. *See California v. Hodari D.*, 111 S. Ct. 1547, 1552 (1991) (noting that the Fourth Amendment does not apply to anything one may abandon

12

while fleeing the police in an attempt to avoid a seizure). Further, in this Circuit, the location of an object is "[o]ne of the most crucial facts." *See United States v. Dillard*, 78 F. App'x 505, 510 (6th Cir. 2003). Here, again, the backpack ended just beside the flight path, merely left on top of the grass. From the standpoint of a reasonable officer, Hatfield abandoned it.

Nor do Hatfield's hypotheticals change the analysis. Did he stop to rest and forget to pick the pack up? Very unlikely, given the mere 100 second duration between when Corporal Rhodes lost Hatfield in the chase and Officer Brown picked up sight of him without the pack. Did he accidentally drop the pack? Again, it was reasonable for officers not to believe that, given that Hatfield had run back and forth across the Cumberland Gap Parkway wearing it and had sprinted forty (40) yards with it in the face of Corporal Rhodes's hot pursuit. He demonstrated an ability to run and persist in carrying the pack. Further, even if he did inadvertently drop the pack, he surely would have known he lost an item as big as that backpack, signaling that he voluntarily kept going without retaining that parcel. Finally, the possibility that he hoped to retrieve the pack later is of no moment. The key is that officers knew, when they found the pack, that Hatfield had, amid the chase, left it aside a beaten path in a clearly visible spot. He also, despite effectively eluding the police and having superior knowledge of the layout, had not returned in the twenty-five-minute interval between dropping it and the officers finding it. Whatever Hatfield subjectively hoped, the officers had a reasonable basis for believing that Hatfield had ditched (read: abandoned) the backpack. *See also United States v. Mayberry*, 125 F.4th 132, 146 (4th Cir.), *cert. denied*, 145 S. Ct. 2722 (2025) (upholding abandonment when defendant left backpack in common stairwell and walked a floor's distance away from it: "The backpack was left in a location in which anyone could have had access to it without the use of a hotel key. The backpack was not hidden from observation in any way. This evidence showed that Mayberry made no attempt to protect the bag

13

or its contents from inspection by others; nor did he take any action indicating an intent to retrieve the backpack later from that location. Instead, he simply left the bag unattended and walked away from it. So, Mayberry 'ran the risk that complete and total strangers would come upon' the bag") (citation omitted)). Same here—Hatfield left the bag, ran away, took no steps to protect the bag or its contents from inspection and took no steps to retrieve it. Rather, he took the open-ended risk that others would come upon the bag. Through the prism of a reasonable officer, he abandoned the backpack.

IV. **Conclusion**

For the stated reasons, the Court **DENIES** Hatfield's suppression motion.[2] *See* DE 15.

This the 2nd day of January, 2026.



Signed By:
*Robert E. Wier* REW
United States District Judge

---

[2] The Government alluded to probable cause but did not rely on any other theory that would validate the warrantless search. The Court does not address the officers' belief that they could search irrespective of abandonment.